UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOY M. WILSON, | CASE NO. 3:13-cv-02401-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM |
| Defendant. | Docs. 1, 6, 7, 9, 12 |

## I.     Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying the application of Plaintiff Joy M. Wilson for supplemental security income ("SSI") and disability insurance benefits ("DIB"). In concluding that Plaintiff was not disabled within the meaning of the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"), the administrative law judge ("ALJ") rejected Plaintiff's testimony and a state agency consultative medical opinion, the only medical opinion in the record. Specifically, the ALJ rejected claims that Plaintiff could not lift more than ten pounds, could never bend, stoop, or kneel, and could not sit, stand, or walk for a combined eight hours out of an eight hour work day. The ALJ rejected these claims because Plaintiff's treatment was conservative, medical imaging and physical exams revealed only minimal objective abnormalities, and because Plaintiff was able to engage in extensive household chores and other activities of daily living ("ADLs"). However, the ALJ failed to acknowledge Plaintiff's explanation for her conservative treatment, namely, her loss of insurance. A lack of objective

findings, alone, is insufficient to reject credibility where there is a medically determinable impairment that could be reasonably expected to produce Plaintiff's symptoms. While Plaintiff's activities of daily living suggest that, with a sit/stand option, she might be able to engage in eight hours of work, the ALJ did not elicit testimony from a vocational expert ("VE") regarding a sit/stand option. Absent an appropriate evaluation of Plaintiff's ability to sit for long periods of time, the Court cannot conclude that substantial evidence supports the ALJ's determination that Plaintiff would be able to engage in a range of sedentary work. Accordingly, the case will be remanded.

## II. Procedural Background

On June 21, 2010, Plaintiff filed an application for SSI under Title XVI of the Social Security Act and for DIB under Title II of the Social Security Act. (Tr. 105-114). On October 5, 2010, the Bureau of Disability Determination denied these applications (Tr. 54-65, 84-93), and Plaintiff filed a request for a hearing on December 6, 2010. (Tr. 94-95). On October 25, 2011, an ALJ held a hearing at which Plaintiff, who was represented by an attorney, Plaintiff's boyfriend, and a vocational expert appeared and testified (Tr. 23-53). On November 4, 2011, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 65-83). On December 30, 2011, Plaintiff filed a request for review with the Appeals Council (Tr. 6-7), which the Appeals Council denied on July 19, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-5).

On September 17, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On November 15, 2013, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 6, 7). On

January 9, 2014, Plaintiff filed a brief in support of her appeal ("Pl. Brief") (Doc. 9). On March 17, 2014, Defendant filed a brief in response ("Def. Brief") (Doc. 12). On May 5, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case for adjudication to the undersigned Magistrate Judge on July 3, 2014, and an order referring the case to the undersigned Magistrate Judge for adjudication was entered on July 16, 2014. (Doc. 15, 16).

### III.    Standard of Review

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988). Substantial evidence requires only "more than a mere scintilla" of evidence, Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), and may be less than a preponderance. Jones, 364 F.3d at 503. If a "reasonable mind might accept the relevant evidence as adequate" to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Johnson, 529 F.3d at 200.

### IV.    Sequential Evaluation Process

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that he has a physical or mental impairment of such a severity that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. § 404.1520; see also Plummer, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. See 20 C.F.R. § 404.1520.  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with

the claimant's abilities, age, education, and work experience can perform. <u>Mason v. Shalala</u>, 994

F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of

the Act lies with the plaintiff. <u>See</u> 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### V. Relevant Facts in the Record

Plaintiff was born on October 25, 1969 and was classified by the regulations as a

"younger individual" through the date of the ALJ decision. 20 C.F.R. § 404.1563. (Tr. 105).

She has at least a high school education and past relevant work as an emergency medical

technician, mental health worker, and cosmetologist (Tr. 77, 134).

On August 10, 2004, Plaintiff saw Dr. James T. Croley, M.D., for a physical. (Tr. 408).

She reported that she had noticed a "curve" in the upper part of her back and discomfort in her

lower back since giving birth to her youngest child in 2003. (Tr. 408). X-rays of Plaintiff's

lumbar and thoracic spine on September 1, 2004 were normal. (Tr. 410, 533). An MRI of the

brain on January 20, 2005 was normal. (Tr. 535). Plaintiff underwent a hysterectomy on June 8,

2005. (Tr. 431). She tolerated the procedure well and was discharged in stable condition. (Tr.

431). On November 1, 2005, Plaintiff saw Dr. Croley complaining of pain in her knees, but she

reported that her health was otherwise "good." (Tr. 455). On November 3, 2005, x-rays of

Plaintiff's knees were normal. (Tr. 536). She was evaluated for knee pain and "some pain in

other areas of her body" on November 16, 2005, and was referred to a rheumatologist. (Tr. 497).

Her blood work was normal, she had a normal gait, and her sensory exam was intact. (Tr. 464-

64, 497).

On February 26, 2007, Plaintiff saw Dr. Joseph Zienkiewicz, D.O. complaining of back

pain. (Tr. 232). She indicated that her pain had worsened since the birth of her son three years

earlier and that, as an EMT, she was frequently lifting patients onto gurneys. (Tr. 232). He prescribed her Flexeril, Ibuprofen, and scheduled a physical therapy consultation. On March 19, 2007, Plaintiff was evaluated for physical therapy admission at Schuylkill Rehabilitation Center. (Tr. 177). She was working full-time, "full-duty" as an EMT. (Tr. 177). Plaintiff was seen for two to three weeks and was discharged on April 27, 2007. (Tr. 178). She reported 70-75% improvement with respect to decreased pain intensity and frequency, increased range of movement, and greater ease doing ADL's. (Tr. 178). Notes indicate that "[p]atient is functional, patient is working full time, full duties." (Tr. 178).

Plaintiff lost her job on April 25, 2008. (Tr. 133). Plaintiff saw Dr. James Croley, M.D. on June 3, 2008 for evaluation of back pain. (Tr. 217). Plaintiff's gait was normal, sensory exam was intact, and she denied weakness or change in bowel or bladder habits. (Tr. 217). Notes indicate that she had been to "physical therapy and felt that it did not help" and that it "aggravated it more." (Tr. 217, 220). Dr. Croley ordered an updated an MRI and planned to follow-up with Plaintiff after reviewing the MRI. (Tr. 217).

On June 4, 2008, an MRI of the lumbar spine indicated multilevel degenerative disc disease/osteoarthritis, with findings most pronounced at L5-S1, "where discogenic disease marginally abuts the S1 nerve roots. No significant compression of the thecal sac, which is tapering at and below the level of the disc space. There is bilateral facet joint osteoarthritis and bilateral foraminal narrowing." (Tr. 192, 277). Specifically, the findings indicate that "[s]agittal lumbar alignment appears maintained. Disc desiccation at L5-S1. Lumbar disc heights appears relatively maintained. Minimal multilevel anterior osteophyte. Conus medullaris tapers at the L2 level."

Plaintiff saw Dr. Croley on July 3, 2008 to go over her MRI. (Tr. 216). Dr. Croley noted that Plaintiff "was found to have a significantly herniated disc at L5-S1…It was suggested that she have a consult with Neurosurgery.  She will consider this option." (Tr. 212). She was still experiencing back pain, but her gait was normal and her sensory exam was intact. (Tr. 212, 216).

On June 28, 2010, Plaintiff saw Dr. Georgetta Lupold, M.D., Dr. Croley's successor.[1] (Tr. 206). She explained that she had not returned for treatment of her back pain because she lost her insurance. (Tr. 206). She reported that she has pain all day, every day most of the time. (Tr. 206). She reported that she had been using Darvocet rarely at night and Tylenol arthritis during the day. (Tr. 206). Her pain was in the left lumbar spine area, although she also complained of tingling in her legs and numbness in her arms, hands, and fingers. (Tr. 206). She reported that her physical therapy in 2008 "helped somewhat." (Tr. 206).  She was "chronically ill appearing." (Tr. 206). She had tenderness in the left lumbar spine area into the sacroiliac joint, some limitation of flexion, and a mildly positive straight leg raise on the left, but no curvature to forward bending, normal heel walk and toe walk without evidence of muscle weakness, normal strength and reflexes in upper and lower extremities bilaterally, and no joint selling or deformity. (Tr. 207). Dr. Lupold planned to have her try physical therapy and take ibuprofen. (Tr. 207).  Dr. Lupold noted that she explained that Plaintiff's "hand weakness and intermittent tingling was NOT related to her lower back and probably NOT carpal tunnel. It does not follow dermatome distribution." (Tr. 207).

On July 26, 2010, Plaintiff saw Dr. Lupold because she claimed she could not continue with physical therapy without "another note." (Tr. 201, 204). Notes indicate that Plaintiff "and

---

[1] Dr. Croley had passed away in the period between Plaintiff's visits. (Tr. 321).

therapist apparently feel the therapy is aggravating her back pain. Last week she had gone on an exercise bike and she had to be helped off the bike to walk out of therapy. Unable to do any back extension exercises in therapy." (Tr. 201). Plaintiff had been using Ibuprofen and Darvocet "off and on but not together and not continuously—will try ibuprofen continuously and add Darvocet." (Tr. 201). Plaintiff reported severe pain in her back and right knee and tingling in her hands. (Tr. 204). Plaintiff was in moderate distress. (Tr. 201). She ambulated "with knees stiff and leaning slightly forward barely moving her back with a shuffle step." (Tr. 201). She had "mild swelling" in her knees and tenderness in her back. (Tr. 201). Dr. Lupold indicated that they would "try therapy through this week and if still aggravating, not complete the course." (Tr. 202).

However, the physical therapy notes do not corroborate Plaintiff's claims that her physical therapist would not let her continue without another note.  Progress notes from all of her therapy visits prior to July 26, 2010 indicate that the plan was to continue physical therapy. (Tr. 245-46). In the therapy appointment that immediately preceded her July 26, 2010 appointment with Dr. Lupold, the notes indicate that the plan was to continue her exercises as tolerated. (Tr. 246). Plaintiff reported pain on July 27 and July 29, 2010, but the notes indicate that the plan was still to continue therapy. (Tr. 247). On discharge, the progress notes that she was being discharged "per primary physician." (Tr. 243, 247).

An MRI from August 16, 2010 indicated "[n]o significant interval change" in comparison to the June 2008 MRI. (Tr. 469). Specifically, there was "a minimal anterolisthesis at the L5-S1 disc space level" and "mild distal lumbar disc degeneration as before with evidence of diminished T2 signal within the L5-S1 disc space." (Tr. 469). At the L5-S1 there was "a

relatively unchanged mild posterior diffuse disc bulge." (Tr. 469). This was "no resulting in significant mass effect or compression either on the thecal sac or the S1 nerve roots." (Tr. 469).

On September 1, 2010, Plaintiff saw Dr. Lupold complaining of pain and tingling in her fingertips, wrist, and feet, along with severe back pain (Tr. 504, 507). She has normal range of motion in her extremities but she was "chronically ill appearing and [in] mild distress." (Tr. 504). Dr. Lupold noted she had an appointment with a rheumatologist in three weeks. (Tr. 504).

On September 23, 2010, Plaintiff saw Dr. Alfred Denio, M.D., for a rheumatology consult. (Tr. 284-86, 332). Plaintiff was very slow to get on and off the examination table but did so without assistance. (Tr. 286). She had some tenderness in the cervical paravertebrals and "very restricted" lumbar motion, along with a slight, minimally exaggerated lordotic posture and minimally antalgic gait. (Tr. 286). She sat "very uncomfortably, leaning to the right in her chair." (Tr. 286). Dr. Denio discontinued Plaintiff's ibuprofen, started her on naproxen and ordered x-rays of Plaintiff's lumbar spine and sacroiliac joints. (Tr. 291). These x-rays indicated that Plaintiff's sacroiliac joints were symmetrical and age appropriate and that, aside from "minimal anterolisthesis of L5 on S1," there was "no evidence of fracture, degenerative changes, or destructive process." (Tr. 292).

On September 29, 2010, Plaintiff had a consultative exam with Dr. Jeffrey Chimahosky, D.O. (Tr. 303). He reviewed her symptoms and history, and noted that Plaintiff's MRI indicated a worsening of multilevel lumbar degenerative disc disease. (Tr. 308). He explained that "[s]he is beginning to show signs of chronic changes due to the lumbar disc disease." (Tr. 309). Dr. Chimahosky observed that Plaintiff had a fifty percent reduced range of motion for flexion and extension in her lumbar spine and decreased range of motion for forward flexion in her hip. (Tr.

305). Dr. Chimahosky also noted that Plaintiff appeared to be experiencing pain, "indicated by facial wincing and groaning." (Tr. 309). He observed that she "[s]tands and moves with a rigid spine and neck, sits stiffly and straight up, resists lying down." (Tr. 309). Plaintiff had a positive straight leg raise, along with "[f]lat back kyphosis of the lumbar spine and "[m]oderate spasm of the lumbar paravertebral muscles bilaterally and moderate spasticity of the lumvar paravertebral muscles bilaterally." (Tr. 309). As a result, Dr. Chimahosky opined that Plaintiff could only occasionally lift two to three pounds. (Tr. 303). He opined that her ability to reach, handle, finger, and feel things was limited by her occasional tingling in the hands. (Tr. 303). He opined that she could never bend, kneel, stoop, crouch, balance, or climb, based on her difficulty dressing and showering. (Tr. 303). He opined that she could only stand for about fifteen minutes at a time, and could stand for less than an hour total out of an eight hour work day. (Tr. 302). He opined that she could sit for less than six hours a day, and can only sit for twenty to thirty minutes at a time before she has to get up. (Tr. 302).

On October 25, 2010, Plaintiff saw Dr. Denio for a follow-up and to discuss her x-rays. (Tr. 343). She reported that her back was "still no better" and her pain was a ten on a ten point scale. (Tr. 343, 348). Notes indicate that Plaintiff was unable to tolerate naproxen due to gastrointestinal problems. (Tr. 343). She reported difficulty walking, but indicated she had no falls in the past month. (Tr. 344). She described her occupation as "homemaker" and indicated that she exercises one to two times per week. (Tr. 345). She reported that her knees had been painful for the previous two weeks. (Tr. 343). Her musculoskeletal exam, pain, and range of motion were normal, but Dr. Denio opined that her knee pain "might be patello femoral by description." (Tr. 343, 345). She was diagnosed with spondylolisthesis and joint pain. (Tr. 350).

Dr. Denio's plan was for Plaintiff to do low impact aerobics, preferably water exercises, at the YMCA, use back support as needed, and consider a facet injection from pain management at L5-S1. Dr. Denio indicated that, as a "last resort," she should seek an opinion from a back surgeon. (Tr. 343). Dr. Denio ordered x-rays of her knees and a physical therapy evaluation for her spondylolisthesis. (Tr. 350). The x-rays of her knees were normal. (Tr. 351). However, Plaintiff later reported that she "tried to go to rehab and Schuylkill Medical for water therapy for her back as suggested by rheumatology and she said they will not take her insurance." (Tr. 516).

On December 15, 2010, Plaintiff was seen at the Orthopedic Associates of Pottsville. (Tr. 490). The only thing she was doing to treat her back pain was taking Advil. (Tr. 490). Notes indicate that Plaintiff reported she was "discharge from Geisinger for [back pain] as well after failed conservative management and the surgery was not considered." (Tr. 490). Plaintiff walked with a stiff gate, but Dr. Guavastino opined that this was related to her back, not her knees. He observed that she was "able to toe and heel walk but she cannot flex much at all to the floor, her back stiffens and spasms." (Tr. 490).Plaintiff's "[s]traight leg raising [was] negative for radicular pain but she is fairly tight in her hamstrings, which would make sense if she indeed had a spondylolisthesis." (Tr. 490).  Plaintiff's x-rays were reviewed, and Dr. Gauvastino indicated that her spondylolisthesis was "barely a grade I," although she did have "sacralization of a bilateral L5 transverse process." (Tr. 490). X-rays of her knees showed "a lot" of arthritis and patella maltracking. (Tr. 490). Notes indicate that "I do not believe that her knees are her main problem, it is clearly her spine. I think she really needs to get back into a long coordinated rehabilitation program, but she says she tried it twice and it did not help. I offered her to try a home exercises regimen, to try the rehab or to refer her back to Geisinger to take a look at her

spine. She decided to try a home exercise regimen…" (Tr. 490). Dr. Guavastino also prescribed Flexor patches. (Tr. 490).

Plaintiff followed up with Dr. Guavastino on January 5, 2011. (Tr. 492). He noted that "I did recommend a rehab program but she said she wanted to try it on her own. She says that it is helping a bit with her back but she is still having some mild problems with her knees." (Tr. 492). Dr. Guavastino prescribed bilateral corticosteroid injections for her knees. (Tr. 492). Plaintiff reported that her pain was a six out of ten and that the Flexor patches were helping her back. (Tr. 492).

On January 11, 2011, Plaintiff saw Dr. J. Scott Martin, M.D., for a neurology consultation. (Tr. 382-83). She had a "significantly excessive lordosis in the lumbar region" and "very poor range of back motion." (Tr. 383). However, her gait was "satisfactory," she could walk "well" on her heel and toe, tolerated straight leg raising "well," her muscles were strong, and her sensory and reflex exams were normal. (Tr. 383). She had not experienced any loss of bladder control. (Tr. 382). Based on this exam and her MRI from October, Dr. Martin assessed her with "minimal" spondylolisthesis at L5-S1. (Tr. 383). He explained that:

> I think the next reasonable step is to consider pain therapy for the spine. Perhaps a facet injection to the left at the L5-S1 would give us some clue as to what is going on here. If these fail to give any significant relief, then I think as a last and only remaining step would be to consider reconstructive spinal fusion. I think exercises have failed, analgesics have been of minimal help, anti-inflammatories are not working, and I believe she is suffering a significantly impaired lifestyle because of this current pain. She will try the pain therapy to see if this is beneficial. She is understandably not very enthusiastic about considering surgery, and I agree with her reluctance to consider it, but I think it may end up being the only option left.

(Tr. 383).

On January 19, 2011, Plaintiff followed up with Dr. Guavastino. She reported that she had no pain in her knees and that her pain was a six out of ten in her back. (Tr. 492). She still "clearly [had] difficulty trying to flex her spine" but did not have a lot of hamstring tightness. (Tr. 493). Dr. Guavastino recommended that she continue her home exercise regimen and return in two months. (Tr. 492).

On February 13, 2011, Plaintiff saw Dr. Ashuk Kumar, M.D., for a pain management consultation. She reported that he pain was at a six on a ten point scale and that her pain interferes with her daily ability to go up and down stairs and get in and out of a car. (Tr. 374). She also reported that she "sometimes" gets numbness in her lower extremities. (Tr. 374). Dr. Kumar noted that her MRI showed minimal anterolisthesis and mild lumbar disc degenerative changes at L5-S1 with mild posterior disc bulge. (Tr. 374). She reported that her pain medications give her "good relief" and that her physical therapy gave her "some" relief. (Tr. 374). However, Plaintiff added a handwritten note to the bottom of this medical record that stated "correction to notes…get some  relief from pain medication, physical therapy gave me more pain by the time I was done." (Tr. 374). She had degreased range of motion, positive straight leg raise tests, and hyperexaggerated deep tendon reflexes. (Tr. 375). Dr. Kumar prescribed a series of lumbar epidural steroid injection. (Tr. 375).

 Plaintiff had the injection on February 16, 2011 with no complications and tolerated the procedure well. (Tr. 377).   However, on follow-up with Dr. Kumar, she stated "I am not going to have that again for three days of pain relief." (Tr. 376). At this follow-up, she also reported having incontinence on three to four occasions over the last two months. She was referred to a

urologist, and Dr. Kumar noted that after her urology evaluation, "we will possibly do left-sided facet joint injection." (Tr. 376). There is no evidence of subsequent treatment with Dr. Kumar.

On August 5, 2011, Plaintiff followed-up with Dr. Guastavino. (Tr. 493). He had not seen her in about seven months and she was "no better or no worse than she was before." (Tr. 494). She was in mild distress. (Tr. 494). She was "not limping but had almost an antalgic gait." (Tr. 494). Plaintiff could "toe and heel walk but only flex to about two feet to the floor." (Tr. 494). She had normal strength and a negative straight leg raise. (Tr. 494). Dr. Guastavino gave her a prescription for the Flexor patches, which she reported helped. (Tr. 494). He asked her to return for follow-up in two months, but Plaintiff cancelled her appointment on September 28, 2011. (Tr. 494). There is no record of any subsequent treatment with Dr. Guastavino.

On September 1, 2011, Plaintiff saw Dr. Lupold. (Tr. 526). She was complaining of numbness and tingling in her legs, arms, and hands. (Tr. 526). She had "[s]ome limitation of flexion, tenderness [in her] left [lumbosacral] area with minimal radiation. (Tr. 526). She had "decreased grip strength on right compared to the left." (Tr. 526). Dr. Lupold referred Plaintiff to the neurology department and prescribed her Tramadol for pain. (Tr. 526). The record does not indicate any subsequent treatment.

Plaintiff completed a Function Report on July 18, 2010. (Tr. 147-156). She reported that bending, standing, walking, climbing in/out of a vehicle, getting dressed, stopping dead in her tracks, and even just sitting on the couch can trigger her pain and tingling feeling. (Tr. 155). She reported that she could not lift anything over five pounds, could only walk about a half a block at one time, could not bend, could not sit for too long because she gets a tingling feeling from her knees down and cannot feel her steps and falls, cannot use hands and arms when they get a

tingling feeling in them. (Tr. 152).  However, she reported that after taking medication, her pain eases to a bearable level of about three or four for about two hours. (Tr. 155-56).

She reported that she cares for her children, making food for them, helping with homework, caring for them when they are sick, and taking them to appointments. (Tr. 148). She reported no problem with bathing, caring for her hair, feeding herself, or using the toilet. (Tr. 148). She reported that it takes extra time to shave and dress. (Tr. 148). She reported that she could make "sandwiches, frozen dinners + complete meals," but also explained that it takes her extra time to do complete meals because she has to keep stopping and taking breaks. (Tr. 149). She reported that it takes all day to do her household chores, but she does laundry every other day and vacuums every day. (Tr. 149). She reported that she could drive, but that it was sometimes painful. (Tr. 150). She explained that she could go shopping for two hours as long as she alternated between walking, standing, and sitting "for a bit." (Tr. 150). She shops for food, household items, clothes, animal food, and bedding for her animals. (Tr. 150).

Plaintiff appeared and testified at the hearing before the ALJ on October 25, 2011. She testified that she was presently treating her back pain with home exercises and using the Flexor patch. (Tr. 28). She testified that she could no longer afford Flexor, or any of her medications, because she lost her insurance. (Tr. 30). She testified that, when she was able to use the Flexor patch, it brought the pain down to a bearable level. (Tr. 30). She explained that she had been doing the home exercises since 2008. (Tr. 29). She testified that she had tried physical therapy twice, but it only aggravated her pain. (Tr. 29). Plaintiff testified that surgery had only been recommended as a last resort. (Tr. 28). When asked if she was thinking about surgery, she responded "No. No. Too many doctors have told me, even now, it would be a very last resort.

They still would not recommend it, so I don't want to have the surgery." (Tr. 29). She testified that she did not continue with injections because it only relieved her pain for three days. (Tr. 41).

Plaintiff testified that she lives in a four-story duplex with her boyfriend and youngest son. (Tr. 30-31). She testified that she had incontinence at night, from once a month to twice a week, and she had to wear protection. (Tr. 39). She testified that she sometimes needs help getting out of bed, getting off the toilet, and getting dressed. (Tr. 40). She explained that she used to be able to clean the entire house in two hours, but now it takes a couple of days because she has to keep stopping. (Tr. 32). She explained that, while her son is at school, she tries to do "any of the chores that I can do, and I do what I can, and then I sit down for a little bit, and then I go back and do some, and then I sit down. Do that pretty much all day." (Tr. 34). Plaintiff acknowledged that it was "fair to say that [she is] up and down most of the day." (Tr. 42).

She testified that she drives to the store to pick up items for supper and to take her son to doctors' appointments. (Tr. 35). She testified that she goes out to eat about once every three weeks and accompanies her boyfriend on weekly grocery trips. (Tr. 35).  She testified that she visits with her mother, and drives with her mother to visit other family members. (Tr. 35). She testified that she accompanies her son to Cub Scouts and basketball and watches what they do there. (Tr. 36). She also testified that she travels to Lock Haven University, two hours away, to watch her son's theater productions. (Tr. 36).

Plaintiff's boyfriend, Michael Rizzardi, also testified. (Tr. 49). He explained that he knew Plaintiff when she was working full-time as an EMT, and that her life and ability to perform everyday activities had gotten progressively worse since the birth of their son in 2003. (Tr. 50). He testified that she has difficulties sitting for long periods of time, walking, and getting out of

the chair or the bed. (Tr. 50).  He testified that she "hobbles more than walks," and cannot put her feet in front of the other. (Tr. 51). He testified that she tries, but struggles to walk more than a block or so. (Tr. 51). He testified that her problems had been going on for about two years. (Tr. 51). He testified that she was able to do "her normal chores like everyone else does, but it's a long—over a long period." (Tr. 52).

The vocational expert testified that an individual with Plaintiff's age, education, and work experience who was limited to light exertion jobs with only occasional postural movements and never climbing ladders, ropes, and scaffolds could perform her past relevant work as a cosmetologist and could also perform other work in the national economy. (Tr. 45-46). She testified that an individual with the same restrictions, but limited to sedentary work, could perform other work in the national economy, including a visual inspector, order clerk, and bench assembler. (Tr. 46-47). The vocational expert testified that, if crediting Dr. Chimahosky's opinion that Plaintiff could only lift and carry two to three pounds occasionally, never bend, kneel, squat, or stoop, and could sit, stand and walk for less than eight hours combined, Plaintiff would not be able to perform any work in the national economy. (Tr. 47). The vocational expert also testified that, if an individual would be absent more than twice per month or would be off task more than ten percent of the time, that individual would not be able to perform any work in the national economy. (Tr. 48).

The ALJ found that Plaintiff was insured through September 30, 2012, and has not engaged in substantial gainful activity since April 25, 2008, the alleged onset date. (Tr. 70, Finding 1-2). The ALJ found that Plaintiff's degenerative joint disease of the knees and degenerative disc disease with minimal spondylolisthesis L5-S1 were medically determinable

and severe impairments. (Tr. 70, Finding 3). The ALJ found that Plaintiff's adjustment disorder was medically determinable but non-severe. (Tr. 70-71, Finding 3). The ALJ found that Plaintiff had the RFC to engage in sedentary work with only occasional postural movements and never climbing ladders, ropes, or scaffolds. (Tr. 72-76, Finding 4). The ALJ found that Plaintiff could not engage in any past relevant work, but that she could engage in other work in the national economy, specifically as a visual inspector, order clerk, and bench assembler.  (Tr. 76-78, Finding 6-10). Accordingly, the ALJ found that Plaintiff was not disabled. (Tr. 78, Finding 11).

### VI.      Plaintiff Allegations of Error

### A.      The ALJ's evaluation of Plaintiff's credibility

The ALJ rejected portions of Plaintiff's testimony. Although he found that she had a medically determinable impairment that would reasonably be expected to cause her symptoms, he found that her claims regarding the intensity, persistence, and limiting effects of those symptoms to be overstated. Specifically, he rejected her claims that she could not lift the ten pounds required for sedentary work, that she could never bend, stoop, or kneel, and that she could not sit, stand, and walk for long periods of time. He based this rejection on three factors. First, he noted that she had only conservative treatment, and that there had been a gap in treatment, writing that Plaintiff "is not on a significant amount of pain medication, is not in intensive treatment, and has not reached a level of incapacity to which surgery is an option for treatment." (Tr. 76).  Second, he asserted that Plaintiff's "own testimony" supported his rejection

of her subjective symptoms. Third, he noted that the medical imaging and physical exams revealed minimal objective abnormalities.[2]

Plaintiff asserts that the ALJ did not properly evaluate Plaintiff's credibility. Plaintiff asserts that the objective medical evidence, specifically her MRIs from June of 2008 and August of 2010 along with the opinion of Dr. Chimahosky, corroborate her claims regarding her subjective symptoms. (Pl. Brief at 6). With regard to her treatment, Plaintiff notes that she testified that back surgery had been recommended, but only as a last resort, that she discontinued the use of her pain medication when she lost her insurance, and that she was not continuing with physical therapy because it aggravated her pain more. (Pl. Brief at 6).

An ALJ may rely on lack of treatment, or the conservative nature of treatment, to make an adverse credibility finding, but only if the ALJ acknowledges and considers possible explanations for the course of treatment. SSR 96-7(p)("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.") The ALJ cited to Plaintiff's December 7, 2010 visit with Dr. Lupold where she reported falling and complained of back and knee pain, but does not acknowledge that she also reported she could not afford to undergo water therapy as recommended because her insurance was not accepted. (Tr. 74, 516). The ALJ acknowledged

---

[2] The ALJ rejected her claimed limitations regarding tingling in her hands because "there is no support in the medical evidence for these allegations." (Tr. 76). The ALJ failed to mention that Dr. Lupold observed, on physical examination, that she had "decreased grip strength" in her right hand, although the ALJ did mention Dr. Lupold's referral to a neurologist from the same day, on the same page of the administrative record. (Tr. 76).

Plaintiff's testimony that the Flexor patch brought her pain down to tolerable levels, but did not

acknowledge that she also testified that she could no longer afford the Flexor patch because she

had lost her insurance. (Tr. 75). The ALJ noted that Plaintiff could not see a neurologist because

she lost her Access Card, but does not state whether he credits that explanation. (Tr. 75). The

ALJ does not note that, at Plaintiff's first appointment after the gap in treatment from 2008 to

2010, she indicated that she had been unable to return to the office because she lost her

insurance. (Tr. 206). Similarly, Plaintiff reported that she did not continue with injections

because they only afforded her three days of relief.[3] Because the ALJ failed to "consider[] any

explanations that the individual may provide, or other information in the case record, that may

explain infrequent or irregular medical visits or failure to seek medical treatment," drawing an

inference and rejecting Plaintiff's credibility on the ground of her treatment course was

improper. SSR 96-7p.

The ALJ also mischaracterized the record with regard to back surgery. The ALJ wrote

that Plaintiff's complaints of pain were not fully credible because she "has not reached a level of

incapacity to which surgery is an option for treatment." (Tr. 76). Earlier, the ALJ wrote "[i]n [Dr.

Martin's] opinion, the [Plaintiff] should consider pain therapy and possible facet injection." (Tr.

---

[3] Although not binding, a review of the case law shows that the cost of epidural steroid injections
can range from $1,271.00, Webb v. Ensco Marine Co., 135 F. Supp. 2d 756, 771 (E.D. Tex.
2001) ($5,085.00 per year for injections every three months) to $4,000.00. McKibbin v. Cairney,
C047638, 2006 WL 2555912  at *6 (Cal. Ct. App. Sept. 6, 2006). See also Kimberly Hancock,
Claimant, FILE NUMBER: 5034064, 2011 WL 2427045 (Iowa Workers' Comp. Com'n June 16,
2011) (Single injection cost $1,897.90 and was considered to be an "unsuccessful" injection
where pain relief lasted only two weeks); Guidry v. Allstate Ins. Co., 2011-517 (La. App. 3 Cir.
12/21/11), 83 So. 3d 91, 100 writ denied, 2012-0225 (La. 3/30/12), 85 So. 3d 121(Each injection
included a $1,507.00 physician fee and a $3,843.98 facility fee); White v. United States, CV-10-
08128-PCT-JRG, 2012 WL 2590764 (D. Ariz. July 5, 2012), appeal dismissed (Dec. 11, 2012)
(Each injection cost $1,500.00).

74). The ALJ fails to mention that, immediately after Dr. Martin noted that Plaintiff should try pain therapy and a facet injection, he wrote that:

> If these fail to give any significant relief, then I think as a last and only remaining step would be to consider reconstructive spinal fusion. I think exercises have failed, analgesics have been of minimal help, anti-inflammatories are not working, and I believe she is suffering a significantly impaired lifestyle because of this current pain. She will try the pain therapy to see if this is beneficial. She is understandably not very enthusiastic about considering surgery, and I agree with her reluctance to consider it, but I think it may end up being the only option left.

(Tr. 383). In October of 2010, Dr. Denio had indicated that, as a "last resort," she should seek an opinion from a back surgeon. (Tr. 343). Thus, although it was characterized as a last-resort, surgery was specifically described as an "option" by both Dr. Martin, a neurosurgeon, and Dr. Denio, a rheumatologist.

The ALJ need not credit these opinions, and, if supported by specific, legitimate reasons, may still be able to conclude that Plaintiff's "conservative" treatment undermines her credibility. However, the ALJ here specifically stated that surgery was not an option, and selectively cited Dr. Martin's opinion that Plaintiff needed pain therapy and injections without acknowledging that he also opined that surgery "may end up being the only option left." This precludes the Court from determining whether the ALJ considered Dr. Martin's opinion regarding surgery, or merely ignored it. As the Third Circuit has explained:

> Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. *See Plummer,* 186 F.3d at 429; *Cotter,* 642 F.2d at 705. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter,* 642 F.2d at 705

Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000). Thus, the Court cannot conclude that Plaintiff's conservative treatment provides substantial evidence to the ALJ's credibility determination.

The ALJ also appeared to discredit Plaintiff's credibility based on her reports of activities of daily living. The ALJ did not specify which portions of Plaintiff's "own testimony" supported his RFC assessment. The Court notes several aspects of Plaintiff's self-report undermine her claim that she cannot lift ten pounds and can never kneel, bend, or stoop. For instance, Plaintiff is able to make "complete meals," (Tr. 149), she vacuums every day, does laundry every other day, and could go shopping for two hours as long as she alternated between walking, standing, and sitting "for a bit." (Tr. 150). She also reported that after taking medication, her pain eases to a bearable level of about three or four for about two hours, although it did not relieve her pain completely. (Tr. 155-56). Plaintiff's boyfriend testified that she was able to do "her normal chores like everyone else does, but it's a long—over a long period." (Tr. 52).

However, these claims do not undermine Plaintiff's assertion that she is unable to sit or stand for long periods of time. In order to go shopping, she had to alternate between sitting, standing, and walking. She testified that it was "fair to say that [she is] up and down most of the day." (Tr. 42). However, sedentary work generally requires six hours of sitting. As the Third Circuit explained:

> Whether there is substantial evidence of appellant's ability to sit for six hours in an eight-hour day is a somewhat closer call. None of the examining physicians discussed how long appellant could sit. Dr. Bagner did observe that appellant sat through the interview without discomfort—an interview appellant testified lasted only 10 minutes, App. at 21—but Dr. Bagner did not estimate how long appellant could sit in an eight-hour day. The only evidence concerning appellant's ability to sit is found in appellant's own testimony. As mentioned earlier, appellant testified that he can sit for 15 to 20 minutes at a time. However, appellant also testified that after sitting for 15 to 20 minutes, he needs to walk

for 10 to 15 minutes. App. at 106. This would mean that, on days when appellant was at his strongest, he would be able to sit for 20 minutes and only need to stand for 10 minutes afterward. Assuming appellant could repeat that pattern throughout the working day, he would have been able to sit—on his best day—for about five hours and twenty minutes. On other days, appellant's capacity to sit would range from four hours to just over five hours.

Yet, ALJ Harap concluded that appellant could sit for six out of eight hours. This decision was apparently based on the ALJ's judgment that appellant underestimated the length of time he could sit. ALJ Harap stated:

> although the claimant testified that he cannot sit or stand for more than ten minutes each, the description of his daily activities shows that he does sit for more than ten minutes at any one time.

App. at 73. Setting aside the fact that appellant testified that he could sit for "15 or 20 minutes," App. at 100, *not* ten minutes, the ALJ did not explain what aspect of appellant's daily routine persuaded him to believe that appellant could sit for longer than he professed he could. Appellant testified that he watched television and read for most of the day. While the ALJ may have inferred from this testimony that appellant was seated during these activities, it is at least equally possible that appellant changed his position throughout the day—sitting for a time, then lying down for a period, pacing about the room for a few minutes, and so on. While five hours and twenty minutes is fairly close to six hours, four hours is not. We decline to conclude that uncertain inferences from appellant's testimony constitute substantial evidence of appellant's ability to sit for six hours in an eight-hour work day.

Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993).

In some cases, an ALJ will accommodate for difficulties with sitting and standing with a sit/stand option. However, the ALJ must elicit testimony from the vocational expert with regard to a sit/stand option:

> In some disability claims, the medical facts lead to an assessment of RFC which compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and

standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

There are some jobs in the national economy -- typically professional and managerial ones -- in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, must jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12. Here, the ALJ did not elicit any VE testimony regarding a sit/stand option.

Moreover, the Court cannot assume that the ALJ would have had substantial evidence to

conclude that a sit/stand option would adequately account for Plaintiff's limitations in sitting and

standing. Plaintiff explained that she sometimes needed to move around, which may not be

accommodated in a sit/stand option. In the absence of a proper adverse credibility finding, those

claims need to be seriously considered, because a lack of objective evidence, alone, is

insufficient to reject complaints of pain:

An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence. While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself. Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence.

Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993)(internal citations omitted).

In sum, the ALJ improperly discounted Plaintiff's credibility for her conservative

treatment without acknowledging her explanation, namely, lack of insurance. The ALJ

improperly found that Plaintiff's activities of daily living established that she is able to sit for six

hours out of an eight hour day in the absence of a sit/stand option. Lack of objective evidence of

symptoms, alone, is insufficient to discount credibility where there is objective evidence of a medically determinable impairment that could be reasonably expected to produce Plaintiff's symptoms. The ALJ proffered no other explanation for discounting Plaintiff's credibility. The ALJ need not credit Plaintiff's symptoms, but he cannot reject her claims, particularly her claimed limitation in sitting and standing for an extended period of time, without specific, legitimate reasons. Moreover, the ALJ bore the burden of proof in this case because it was decided at step five. Thus, the ALJ lacked substantial evidence for his credibility finding. Because the ALJ's RFC assessment and step five analysis depended on this credibility finding, his determination that Plaintiff was not disabled also lacks substantial evidence. The Court will grant Plaintiff's appeal, vacate the decision of the Commissioner, and remand for further findings.

### B.    The ALJ's evaluation of Dr. Chimahosky's opinion

Plaintiff asserts that the ALJ failed to give an adequate rationale for rejecting the examining source opinion of Dr. Chimahosky.[4] The ALJ wrote that:

> The results of the consultative exam in Exhibits 12F and 13F are given great weight. The limitations in the RFC by the consultative examiner are given little weight because the limitations are not supported by the examiner's own findings. On the physical examination, which was mostly normal, there was normal range of motions except for 45 degrees on the lumbar spine.

(Tr. 76).

---

[4] Plaintiff also asserts that she the ALJ's decision at step three lacks substantial evidence, and that she should have met a Listing. However, Plaintiff does not develop this argument further, and does not identify which Listing(s) she purportedly meets. The Court will not consider this undeveloped argument. Kirk v. Comm'r of Soc. Sec., 177 F. App'x 205, 208 n. 4 (3d Cir. 2006); Conroy v. Leone, 316 F. App'x 140, 144 n. 5 (3d Cir. 2009).

The ALJ's assignment of weight lacks substantial evidence for several reasons. First, this explanation precludes meaningful judicial review. The ALJ assigns the consultative exam "great weight," but assigns the RFC assessment "little weight." This begs the question-to which portion of the exam did the ALJ assign great weight, if not the RFC assessment?

Second, the ALJ mischaracterized Dr. Chimahosky's findings. Dr. Chimahosky also noted that Plaintiff's MRI indicated a worsening of multilevel lumbar degenerative disc disease. (Tr. 308). He explained that "[s]he is beginning to show signs of chronic changes due to the lumbar disc disease." (Tr. 309). Dr. Chimahosky also noted that Plaintiff appeared to be experiencing pain, "indicated by facial wincing and groaning." (Tr. 309). He observed that she "[s]tands and moves with a rigid spine and neck, sits stiffly and straight up, resists lying down." (Tr. 309). He also observed "[f]lat back kyphosis of the lumbar spine and "[m]oderate spasm of the lumbar paravertebral muscles bilaterally and moderate spasticity of the lumbar paravertebral muscles bilaterally." (Tr. 309). She also had a positive straight leg raise test. (Tr. 309).

Positive straight leg raises, muscle spasm, and degenerative changes of the lumbar spine are all objective clinical findings that are not "normal" and were not acknowledged by the ALJ. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000) (remanding where ALJ failed to mention "contradictory, objective medical evidence," included MRI showing spondylolisthesis, loss of range of motion, mild limp, and tenderness); Johnson v. Comm'r of Soc. Sec., 263 F. App'x 199, 204 (3d Cir. 2008) ("objective findings" include range of motion and discomfort while being seated); Jorich v. Colvin, 3:12-CV-01627, 2014 WL 2462963  at *2 (M.D. Pa. May 29, 2014) ("objective findings" included reduced flexibility and painful range of motion); Keller v. Colvin, 3:12-CV-01502, 2014 WL 658064 at *9 (M.D. Pa. Feb. 20, 2014)

("positive objective findings" included reduced range of motion of the lumbar spine and muscle spasm); Batts v. Barnhart, CIV.A. 01-507, 2002 WL 32345745 (E.D. Pa. Mar. 29, 2002) report and recommendation adopted, CIV.A.01-507, 2002 WL 862575 (E.D. Pa. May 3, 2002) ("objective findings" included decreased range of motion and tenderness to palpitation); Kelly v. Colvin, CV 09-759-RGA-SRF, 2013 WL 5273814 at *12 (D. Del. Sept. 18, 2013)(collecting cases). The ALJ is not required to credit these findings, but he must acknowledge them and provide specific reasons for rejecting them. Burnett, 220 F.3d at 122. Otherwise, his characterization of the findings as "normal" except for a decrease in range of motion is disingenuous.

Third, to the extent the ALJ considered the above clinical findings, along with Plaintiff's decreased range of motion, and concluded that these findings do not support the doctor's findings, such a conclusion would be an impermissible inference from the medical records. As one Court in this District has explained, "'Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor' because 'lay intuitions about medical phenomena are often wrong.'" Shedden v. Astrue, 4:10-CV-2515, 2012 WL 760632 at *9 (M.D. Pa. Mar. 7, 2012) (quoting Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir.1990)). Moreover, an ALJ may not make "speculative inferences from medical reports." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).

The Court notes that many of Plaintiff's activities of daily living contradict Dr. Chimahosky's findings, as described above. However, this rationale was not included in the ALJ's determination, and the Court will not engage in post-hoc rationalizations. Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs., 730 F.3d 291, 305 (3d Cir. 2013)

(Although a Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," review must be based on "the administrative record [that was] already in existence" before the agency, not "some new record made initially in the reviewing court or post-hoc rationalizations made after the disputed action); Peak v. Colvin, 1:12-CV-1224, 2014 WL 888494 at *5 (M.D. Pa. Mar. 6, 2014)( "[T]he district court may not create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself.") (internal citations omitted). Moreover, as discussed above, Plaintiff's ADLs do not contradict Dr. Chimahosky's contention that Plaintiff is unable to sit or stand for long periods of time without moving and changing position.

## VII.   Conclusion

Therefore, the Court finds that the decision of the ALJ lacks substantial evidence. Pursuant to 42 U.S.C. §§ 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order in accordance with this Memorandum will follow.

Dated: August 19, 2014                              s/Gerald B. Cohn
                                                                   GERALD B. COHN
                                                    UNITED STATES MAGISTRATE JUDGE